## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Timothy Scott Moore,

               Plaintiff,

    v.

Epperson Underwriting Company,
d/b/a Lumbermen's Underwriting
Alliance,

               Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 06-2563 ADM/AJB

---

Clayton D. Halunen, Esq. and Frances E. Baillon, Esq., Halunen & Associates, Minneapolis, MN, argued on behalf of Plaintiff.

David J. Goldstein, Esq. and Loralei C. Lannan, Esq., Faegre & Benson LLP, Minneapolis, MN, argued on behalf of Defendant.

---

## I. INTRODUCTION

On May 29, 2007, oral argument before the undersigned United States District Judge was heard on Defendant Epperson Underwriting Company's ("Epperson") Motion for Summary Judgment [Docket No. 15]. In his Complaint [Docket No. 1], Plaintiff Timothy Scott Moore ("Moore") asserts claims of discrimination and retaliation in violation of the Uniformed Services Employment and Reemployment Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301-4333, retaliation in violation of the Minnesota Whistleblower's Act ("MWA"), Minn. Stat. § 181.932, and disability discrimination and retaliation in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.08, subd. 2, and 363A.15.[1] For the reasons set forth herein, Defendant's Motion is granted in part and denied in part.

---

[1] Moore has withdrawn his claims for defamation and forced republication defamation. Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. [Docket No. 37] at 2 n.2.

## II. BACKGROUND[2]

A.      **Moore's Military Service and Medical History**

In 1996, Plaintiff Timothy Moore enlisted in the Marines as an infantryman.  Moore Dep. (Pl.'s Exs. [Docket No. 38] at P 1-64, P 181-215; Def.'s Exs. [Docket No. 18] at EPP 129-43) at 16, 24.  In 2000, after fulfilling his commitment of four years of active duty, Moore assumed reserve status and continued his education at the University of Wisconsin-Eau Claire.  Id. at 25-28.  In June 2004, Moore was recalled to active duty.  Id. at 33.  From September 2004 to March 2005, Moore served in Iraq as a weapons platoon sergeant.  Id. at 34-35.  In late March 2005, Moore's tour of active duty ended and he returned to Eau Claire to seek employment.  Id. at 55-56.  Moore remained in the Marine Reserves.

Upon his return to Eau Claire, Moore consulted with Craig Johnson ("HM1 Johnson"), a Navy hospital corpsman, first class,[3] regarding symptoms of frequent bowel movements, abdominal pain, fatigue, nausea, and insomnia.  Id. at 39-40; Johnson Dep. (Pl.'s Exs. at P 179-80; Def.'s Exs. at EPP 120-26) at 7-8.  In May 2005, doctors diagnosed Moore with Crohn's disease, a chronic inflammatory disorder of the gastrointestinal tract.  Pl.'s Exs. at P 281.  Additionally, in September 2005 Moore was diagnosed with primary sclerosing cholangitis, an illness in which constriction and scarring of the biliary ducts eventually leads to liver failure.  Moore Dep. at 46.  By letter dated January 6, 2006, the Department of Veterans Affairs granted Moore compensation benefits based on a finding that his inflammatory bowel disease/ulcerative

---

[2] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

[3] "HM1" is the military abbreviation for hospital corpsman, first class.

colitis and intrahepatic primary sclerosing cholangitis were service-related.  Pl.'s Exs. at P 289-90.

**B.    Moore's Employment at Epperson**

   **1.    Hiring Process**

Epperson manages the Lumberman's Underwriting Exchange ("LUA"), a reciprocal inter-insurance exchange that provides insurance for the forest products industry.  M. Moore Dep. (Pl.'s Exs. at P 154-66, P258; Def.'s Exs. at EPP 97-113, EPP 167-75; Def.'s Supp. Exs. [Docket No. 43] at EPP 219-20) Ex. 4 at I-III.  Epperson employs Sales Representatives to sell LUA's insurance products and Loss Prevention Representatives ("LPR") to assess and control risk of entities insured by LUA.  Moore Dep. Ex. 4; Eystad Dep. (Pl.'s Exs. at P 177-78; Def.'s Exs. at EPP 114-19) at 5.  LUA serves logging and lumber companies located in Iowa, Wisconsin, and Minnesota.  Eystad Dep. at 5-6; Goffin Dep (Pl.'s Exs. at P 143-53, P 242-57; Def.'s Exs. at EPP 76-96, EPP 159-68) at 99.

In May 2005, Moore applied for a vacant LPR position with Epperson.  Moore Dep. Ex. 1.  The position covered territory in Minnesota that had previously been assigned to Senior Loss Prevention Specialist Tim Goffin ("Goffin") and other LPRs.  Mershimer Dep. (Pl.'s Exs. at P 65-142, P 216-41; Def.'s Exs. at EPP 144-58) at 113, 216.  Epperson's plan was that the new LPR would eventually succeed Goffin and assume responsibility for his accounts, which were primarily in Wisconsin.  Goffin Dep. at 19-20.  Goffin became eligible to retire in August 2007. Id. at 18-19.

Moore was hired in July 2005 after a lengthy screening process that included interviews with Loss Prevention Manager Kevin Mershimer ("Mershimer"), Regional Loss Prevention

Manager Howard Twining ("Twining"), and Goffin.  Mershimer Dep. at 18, 65, 75.  During the interview process, Epperson personnel informed Moore that the LPR position required extensive travel and nights away from home, including a rigorous three-month training program.  Moore Dep. at 70, 74.  Moore was told he would have to travel from his home in Eau Claire to Epperson's office in Minneapolis to review files and submit paperwork, and that he could not work from home until he gained experience.  Id. at 96-97.  Moore stated that the travel was not an issue for him, especially since he had just been on active duty military status in Iraq.  Id. at 91.  During the interview process, Moore notified Epperson personnel that he would need to report for duty in the Marine Reserves when necessary.  Id. at 80-81.

> 2.    **Training**

> a.    **Moore's First Two Months**

Epperson's training program consists of several components.  Typically, the trainee travels each Monday to a different location for training and then returns home late Friday or early Saturday.  Id. at 70, 89.  During other weeks, the trainee receives field training in his home territory by traveling and visiting customers with an experienced employee.  M. Moore Dep. at 177-78.  Halfway through the training program, a trainee must successfully answer questions posed by a panel of managers.  Id.  The trainee must pass a second panel examination at the end of the program.  Id.

Moore's training began the week of July 4, 2005.  Moore Dep. Ex. 7.  Moore was supervised by Mershimer, who worked from his home in Pennsylvania.  Mershimer Dep. at 60.  Moore satisfactorily progressed through two months of training and passed his first panel examination on September 5, 2005.  Moore. Dep. at 123, Ex. 7.  The panelists were Assistant

Vice President of Loss Prevention Will Nance ("Nance"), Twining, and Mershimer.  Id. at 123,

Ex. 7.

### b.     Moore's Absence for a Medical Procedure in Late September 2005

In late August 2005, Moore requested and received time off for a surgical procedure

scheduled for late September.  Mershimer Dep. at 80-81.  Epperson's employee leave is

controlled by the company's Employee Managed Time Off ("EMTO") Policy.  M. Moore Dep.

Ex. 4.  Under this policy, an employee accrues paid leave during each pay period.  Id.  The

employee can use his accrued paid leave for personal needs such as vacation, emergencies,

family care, and recovery from short term illness.  Id.  Epperson's policy did not allow use of

accrued leave during the first 90 days of employment.  Id.  Although Moore was within his first

90 days of employment, Assistant Vice President of Human Resources Mary Moore ("A.V.P.

Moore") and Nance decided to make an exception to Epperson's policy and apply Moore's

accrued paid leave to his September medical absence.  M. Moore Dep. at 63-68.

Moore informed Mershimer that the scheduled surgical procedure "was for a service-

connected medical condition, and that I believed it would fall under USERRA protection."

Moore Dep. at 131; Mershimer Dep. at 88.  On September 22, 2005, Moore underwent an

Endoscopic Retrograde Cholangio-Pancreatography ("ERCP") at the Mayo Clinic.  Pl.'s Exs. at

P 304.  Moore expected to miss two days of work.  However, he was hospitalized from

September 23-28 with post-ERCP pancreatitis.  Moore Dep. Ex. 14.  Moore's wife, Christina,

called Mershimer on September 23, 2005, to inform him that her husband could not return to

work until October 3.  C. Moore Dep. (Pl.'s Exs. at P 167-69; Def.'s Exs. at EPP 127-28) at 31-

32; Mershimer Dep. at 96-97.  Christina Moore avers that Mershimer told her to tell Moore "to

hurry up and get back to work." <u>Id.</u> at 31.

Moore's doctors determined he could not work at full strength until October 10, 2005. Moore Dep. Ex. 14.  As a result, Moore asked Mershimer for permission to work from home during the week of October 3.  <u>Id.</u> at 147.  Mershimer gave him a sizeable amount of work to do from home.  <u>Id.</u> at 147, 150-51.  Moore testified that:

> Mr. Mershimer said that he had to justify to Boca [Raton, Florida] corporate headquarters that I could be gainfully employed while at home.  And I asked if he thought that was fair to give me such a large amount of work, and I believe he said you just need to do it.  Do it or else.  And I took that as kind of a threat.

<u>Id.</u> at 152.  Moore alleges Mershimer was surprised when he completed the assignment.  <u>Id.</u> at 160.  While doing this assignment, Moore received permission from Mershimer to purchase an ink cartridge for his home printer.  Mershimer Dep. Ex. 16.

Moore returned to work on October 10, 2005, and continued training until his next medical leave on October 19, 2005.  On October 14, Goffin and Mershimer exchanged emails regarding Moore's upcoming training with Goffin on October 17 and 18.  Goffin Dep. Ex. 3. Goffin, who had previously worked with Moore, stated Moore might have problems with the travel requirements of the LPR position, but that "[w]e will have to wait until the medical issues are resolved and the training program is completed to actually find out."  <u>Id.</u>

### c.    Moore's Absence for a Medical Procedure in Late October 2005

On October 20, 2005, Moore underwent a follow-up ERCP at the Mayo Clinic.  Pl.'s Exs. at P 295.  Moore again suffered complications and was admitted to the hospital on Sunday, October 23.  Moore Dep. Ex. 19.  Moore avers that Mershimer pressured him to return to work and suggested he needed to choose between missing time for his medical condition and keeping his job.  <u>Id.</u> at 167.  Despite his doctor's directions that he not return to work before October 31,

Moore reported to Goffin for training on October 25.  Def.'s Exs. at EPP 179-80; Moore Dep. at 167-68.  Because Moore was in obvious pain in front of customers, Goffin drove him home early.  Goffin Dep. at 39-40.  Goffin informed Mershimer that Moore "has a lot of grit" and that "[w]hen Tim can put the medical issues behind him, he will be a good Loss Prevention Representative."  Id. Ex. 4.

Moore again returned to work on October 31, 2005, and trained that week with Account Representative Jay Eystad in Minnesota.  Eystad Dep. at 17.  Eystad avers Moore expressed concerns about the travel required for the LPR position.  Id. at 32.  Eystad discussed Moore's comments with Bill Dupont ("Dupont"), the Office Manager for Epperson's Minneapolis Office. Id. at 33; Mershimer Dep. at 27.  Dupont subsequently informed Mershimer of those comments.

### d.    Moore Trains With Mershimer in Early November 2005

During the week of November 7, 2005, Moore trained with Mershimer in Minnesota. Mershimer Dep. at 84.  Up to this point, Mershimer avers Moore's performance at Epperson was "fair" because he had missed a lot of training.  Id. at 108.  Considering the training Moore had received to date, Mershimer "didn't have any complaints."  Id.

Around November 8, Moore informed Mershimer that it was belittling and hurtful for Mershimer to suggest that Moore needed to choose between his job and his health.  Id. at 92-93; Moore Dep. at 173.  Moore also told Mershimer that he thought that Epperson had violated USERRA by deducting from his accrued paid vacation to cover his medical absences.  Moore Dep. at 173-74; Mershimer Dep. at 224.  Moore offered to have a representative of the Employer Support of the Guard and Reserve ("ESGR") explain USERRA's requirements to Mershimer. Moore Dep. at 173.  Moore alleges Mershimer told him "not to stir the waters any more than I

already had" and that "I was told my job was up against the fence, I'm making Mr. Mershimer

look bad, and basically I needed to choose between . . . a paycheck, support my family, and

taking time off." Id. at 174, 183.

Mershimer, however, alleges he encouraged Moore to provide him with information

about USERRA so that Epperson could investigate and, if necessary, remedy the alleged

USERRA violation by reimbursing Moore's vacation days.  Mershimer Dep. at 113.

Additionally, Mershimer alleges Moore stated that the extensive travel required for the job had

become a concern because of his medical issues, and that his wife and doctor both suggested he

not travel so much.  Id. at 106.  Further, Mershimer claims Moore was unhappy about paying

personal mileage expenses for the drive from Eau Claire to Minneapolis.  Id. at 110.  Mershimer

avers Moore told him "he wasn't sure if this job was for him anymore."  Id. at 106, 270.  Moore

disputes that he raised these concerns or expressed unhappiness with his job.  Moore Dep. at

178-79.

### e.      Epperson Investigates Moore's USERRA Complaint

Subsequently, Moore provided Mershimer with contact information for Mike Smith

("Smith"), Executive Director at ESGR.  Mershimer Dep. at 86.  Mershimer discussed Moore's

situation with Smith.  Id. at 90-91.  On November 12, 2005, Mershimer asked Don Berkman

("Berkman") of Epperson's human resources department to investigate whether Epperson's

EMTO policy requiring the use of paid leave before unpaid leave violated USERRA.  Id. Ex. 20.

### f.      Epperson Offers Moore a Severance Package in Mid-November 2005

While Epperson investigated Moore's USERRA complaint, the sequence of events

leading to Moore's termination unfolded.  Around November 10, 2005, Dupont informed

8

Mershimer of the travel concerns Moore had discussed with Eystad, and Dupont asked whether Moore would "stick it out." Id. at 196. Also on November 10, Mershimer alleges he discussed with Moore certain improper expenses he had submitted for cell phone calls and a color ink cartridge. Id. at 185-86. Moore contends the ink cartridge issue arose only after he was terminated. Moore Dep. at 185. Moore claims no one at Epperson ever discussed a cell phone issue with him. Id. at 188.

During the week of November 14, 2005, Moore attended training at Epperson's corporate headquarters in Boca Raton, Florida. Moore Dep. at 190. Mershimer testified he learned that "Tim failed to come to a meeting, that Tim came down with a fairly negative attitude, there were comments about his activities in the class and his attitude in class." Mershimer Dep. at 197, 231-32. Moore does not dispute that he missed a meeting. Moore Dep. at 191. Moore does dispute that he had a negative attitude, although he did inform another trainee of the difficulties he encountered when he needed time off for medical treatment. Id. at 196.

After hearing these reports, Mershimer contacted Nance and Twining, and they discussed "Tim's concerns, how we felt about him not being able to commit, him going to Florida and not committing, his health, and his decision whether he was going to stay with the job." Mershimer Dep. at 190. Nance decided Epperson should offer Moore the opportunity to resign and receive three weeks of pay to look for another job. Id. at 189. On November 18, 2005, Mershimer told Moore it was obvious he planned to leave Epperson, and that Moore's alleged complaints "had me called to the carpet on my ability to [e]ffectively lay out the expectations and ultimately do my job as a manager." Id. at 194, Ex. 17. Moore declined the severance package and chose to continue working for Epperson. Moore Dep. at 194-95.

### g.        Mershimer Reviews Concerns with Moore

On November 27, 2005, Mershimer gave a memorandum to Moore recapping Moore's

training during the week of November 7, 2005.  Mershimer Dep. Ex. 24.  The document

summarized Moore's alleged complaints regarding travel and personal mileage expenses, and

stated that "[i]f you choose to continue down this path [continued employment with Epperson], I

will expect a new approach towards the position and the company.  You have missed a large

quantity of the training due to personal reasons which will make the final panel more crucial to

your success."  Id.  Concerned that Mershimer was using his medical absences against him,

Moore faxed Epperson a November 28, 2005, letter from HM1 Johnson stating that:

> SGT Moore is currently seeking professional medical treatment and following-up care for
> a medical condition that occurred while he was activated for active duty in support of
> Operation Iraqi Freedom . . . .  Timothy Moore is required to attend all doctors
> appointments and follow-up appointments to determine the full extent of his medical
> conditions.

Moore Dep. Ex. 21.

### h.        Moore is Terminated

On November 28, 2005, Nance, Twining, Mershimer, and A.V.P. Moore participated in a

conference call to discuss Moore's situation.  M. Moore Dep. Ex. 1.  Mershimer's notes from the

call state that Epperson would terminate Moore because "we think he will eventually leave us!"

and because "we feel he is spreading venom throughout the trainees/company—complaining

about the way we have treated him."  Mershimer Dep. Ex. 23.

On November 29, 2005, Moore underwent a colonoscopy/biopsy for his inflammatory

bowel disease and his recently diagnosed primary sclerosing cholangitis.  Pl.'s Exs. at P 291.

Moore's leave of absence request form stated he would miss work from November 29 through

December 3.  Moore Dep. Ex. 22.  On the afternoon of November 30, 2005, Moore faxed Epperson's human resources department a doctor's note authorizing him to return to work on December 1.  Id. Ex. 23.  On December 1, Moore reported to Epperson's Minneapolis office and then began a four-hour drive to meet with a client by himself.  Id. at 206.

After learning that Moore had returned to work, Mershimer called Moore's cell phone. Id. at 206-07; Mershimer Dep. at 262.  Mershimer was unaware that Epperson's human resources department had received a doctor's note authorizing Moore to return to work.  Moore Dep. at 206-07; Mershimer Dep. Ex. 25.  Mershimer alleges he instructed Moore to return home but that Moore was reluctant to do so since he had driven a substantial distance.  Mershimer Dep. Ex. 25.  Moore alleges Mershimer instructed him to pull to the side of the road and await further instructions.  Moore Dep. at 206-07.  After waiting two hours, Moore returned home.  C. Moore. Dep. at 61-62.  On the morning of December 2, Mershimer informed Moore he could return to work.  Mershimer Dep. Ex. 25.

However, Mershimer had decided that this most recent incident "was the final straw in this saga" and that Moore should be terminated.  Id.  By December 2, Mershimer and Twining agreed Moore should be terminated. Id. Ex. 26.  On December 3, Mershimer emailed Twining a list of reasons for Moore's termination:

1.    Inability to follow directions: I specifically told him for the third time, not to return to work until a work release was sent to BRO [Boca Raton office] and I was given the OK by human resources to allow him back to work.  He again went back to work early on 12-1-05.

2.    Inability to use sound judgment with LUA finances: Wrote off a color ink jet as well as the black cartridge (I gave permission for black).

3.    Inability to follow directions: Cell phone charges being rounded up with no receipts.

4.    Inability to keep his manager informed: Left early Monday the 28th of [November] and failed to call his supervisor.  Taking next three days off (I was informed of those).

5.    Shows propensity to not to want to travel: left during a training week and drove two hours home and back the next day instead of working at night on training. Week with Tim Goffin.

6.    Lack of citizenship: Has complained to supervisor, trainers and trainees about company and how he has been mistreated.

7.    Shows propensity to not want to travel: Has voiced displeasure and pains to family; to supervisor, trainers and trainees about traveling.  In fact he has done the least traveling than any trainee in my history.

8.    Has voiced displeasure about distance to office and having to pay for personal mileage.  This was explained well during hiring process.

Id.  By December 5, Nance and A.V.P. Moore had agreed that Moore should be terminated.  Id. at 271-72.

On December 6, 2005, Mershimer, Moore, and A.V.P Moore participated in a conference call during which Moore was terminated.  Moore Dep. at 239.  Moore filed his Complaint in the instant action on June 22, 2006.

### III. DISCUSSION

A.    **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion

12

for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     USERRA Claims**

   **1.     Discrimination**

Moore's Complaint alleges that Epperson discriminated against him in violation of USERRA.  USERRA's discrimination provision, 38 U.S.C. § 4311(a), provides that "[a] person who is a member of, performs, . . . has performed, . . . or has an obligation to perform service in a uniformed service shall not be denied . . . retention in employment . . . or any benefit of employment by an employer on the basis of that membership, . . . performance of service, . . . or obligation."  An employer violates § 4311(a) if a "person's membership, . . . service, . . . or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, service, . . . or obligation for service."  38 U.S.C. § 4311(c)(1).

"Unlike the McDonnell Douglas framework . . . the procedural framework and evidentiary burdens set out in section 4311 shift the burden of persuasion, as well as production, to the employer."  Gagnon v. Sprint Corp., 284 F.3d 839, 854 (8th Cir. 2002).  Thus, a plaintiff asserting a USERRA claim must show that "military status was at least a motivating or substantial factor in the [employer's] action, upon which the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status."  Sheehan v. Dep't of Navy, 240 F.3d 1009, 1014 (Fed. Cir. 2001).

Moore contends his absences to treat his service-related medical conditions qualified as military service and therefore Epperson violated USERRA when it allegedly terminated him because of those absences.  See Moore Dep. at 135-36.  Moore also claims Epperson violated USERRA by harassing him and forcing him to use his accrued vacation time for his medical absences.[4]  See id.  Epperson argues Moore can not prevail on a USERRA discrimination claim because his medical appointments did not constitute "service in the uniformed services."

USERRA provides that:

"[S]ervice in the uniformed services" means the performance of duty on a voluntary or involuntary basis in a uniformed service under competent authority and includes active duty, active duty for training, initial active duty for training, inactive duty training, full-time National Guard duty, a period for which a person is absent from a position of employment for the purpose of an examination to determine the fitness of the person to perform any such duty . . . .

38 U.S.C. § 4303(13).  In his brief, Moore attempts to qualify his medical absences as "service" because he was treated for a service-related condition.  This argument fails, however, because the sole inquiry under USERRA's definition of "service" is whether Moore's medical absences constituted performance of a military duty under competent authority.  Whether Moore's medical condition is service-related is irrelevant under the statute.

At oral argument, Moore argued his various medical appointments and procedures were examinations to determine his fitness for military duty.  Moore relies heavily on HM1 Johnson's November 28, 2005, letter, which stated Moore was "required to attend all doctors appointments and follow-up appointments to determine the full extent of his medical conditions."  Moore Dep. Ex. 21.  However, at his deposition, Johnson clarified this letter was not an order, but merely a

---

[4] 38 U.S.C. § 4316(d) provides that an employer can not require an employee to use accrued paid vacation if the employee is absent for a period of military service.

recommendation he wrote at Moore's request.  Johnson Dep. at 23-24.  Moore was not placed on

a line of duty ("LOD") for his medical appointments, and only a commanding officer could issue

a LOD.  Id. at 22-24.  Johnson was not a commanding officer in Moore's chain of command.  Id.

at 9.  Johnson's undisputed testimony demonstrates that Moore was not performing a military

duty under competent authority when he attended his medical appointments.  Therefore,

USERRA's anti-discrimination provision does not apply, and summary judgment is granted to

Epperson on Moore's USERRA discrimination claim.

**2.      Retaliation**

Moore alleges retaliation based on Epperson's actions after he reported a possible

USERRA violation during the week of November 7, 2005.  Moore argues Mershimer retaliated

by initiating an investigation that ultimately led to Moore's termination.  The USERRA standard

for retaliation claims is codified at 38 U.S.C. §§ 4311(b) and 4311(c)(2):

> (b)  An employer may not discriminate in employment against or take any adverse
> employment action against any person because such person (1) has taken an action to
> enforce a protection afforded any person under this chapter . . . .  The prohibition in this
> subsection shall apply with respect to a person regardless of whether that person has
> performed service in the uniformed armed services.

> (c)  An employer shall be considered to have engaged in actions prohibited—(2) under
> subsection (b), if the person's (A) action to enforce a protection afforded any person
> under this chapter, . . . or (D) exercise of a right provided for in this chapter, is a
> motivating factor in the employer's action, unless the employer can prove that the action
> would have been taken in the absence of such person's enforcement action, . . . or
> exercise of a right.

To survive summary judgment on his USERRA retaliation claim, Moore must present

sufficient evidence that his USERRA report was a substantial factor in Mershimer's decision to

investigate him or in Epperson's decision to terminate him.  Gagnon, 284 F.3d at 854.  If Moore

makes such a showing, then the burdens of persuasion and production shift to Epperson to show

15

that the investigation and termination would have occurred even if Moore had not asserted rights under USERRA.  Id.

As evidence that Epperson retaliated against him, Moore relies on the temporal proximity between his USERRA report in early November 2005 and the subsequent events that led to his dismissal on December 6, 2005.  See Smith v. Riceland Foods, Inc., 151 F.3d 813, 819 (8th Cir. 1998) (noting in Title VII cases that "a plaintiff can establish a causal connection between statutorily protected activity and an adverse employment action through circumstantial evidence, such as the timing between the two events").  Moore also relies on Mershimer's alleged statement that Moore should not "stir the waters" by contacting the ESGR.

A genuine issue of material fact exists as to whether Epperson's decision to terminate Moore was motivated by his USERRA report.  Before Moore reported a possible USERRA violation, Mershimer testified he had no complaints about Moore's performance.  Mershimer Dep. at 108.  Less than two weeks later, Epperson offered Moore a severance package because of his alleged travel complaints and performance issues, which surfaced only after the USERRA report.  By December 6, Moore was terminated.  This close timing of events, along with the allegation that Mershimer discouraged Moore from contacting the ESGR, raise an inference that Moore's USERRA report was a motivating factor in his termination.

Arguing against a causal connection, Epperson relies on evidence that Mershimer promptly reported Moore's USERRA concerns to Epperson's human resources department. However, given the close temporal proximity of Moore's USERRA report and Mershimer's comment, whether there was retaliatory motivation should be considered by a jury.

Epperson also argues that the record conclusively shows Moore would have been

16

terminated even if he had not asserted rights under USERRA.  Epperson's stated reasons for terminating Moore were complaints about travel, failure to follow company procedures regarding returning to work after medical treatment, improper ink cartridge and cell phone expenses, and Moore's inability to effectively communicate with Mershimer.  Again, genuine issues of material fact are raised concerning the validity of these reasons provided for termination.

There is evidence that by early November 2005, Moore had raised concerns about travel with Goffin, and Goffin reported them to Mershimer.  Goffin Dep. at 51-55.  There is also evidence that Moore raised travel concerns with Eystad, who at some point relayed the information to Dupont, who then spoke with Mershimer.  Eystad Dep. at 32-33; Mershimer Dep. at 27.  Mershimer's frustration with travel complaints is well documented.  However, Goffin could not recall another trainee who had been terminated for raising travel concerns.  Goffin Dep. at 55.  Although Mershimer testified Moore complained to him about travel, a jury could credit Moore's testimony that he never complained to Mershimer.

Epperson alleges Moore was terminated in part for his failure to follow company procedures and communicate with Mershimer when he returned to work after his medical appointments.  Epperson refers to the fact that Moore returned to work on October 25, 2005, without proper authorization from his doctor.  However, there is no documentation that Moore was counseled about this incident.  Epperson also refers to Moore's return to work on December 1, 2005.  However, there is evidence that Moore faxed the necessary doctor's note to Epperson's human resources department a day earlier.  Moore Dep. Ex. 23.  On this record, a jury could choose to reject Epperson's proffered explanation that Moore was terminated for returning to

work without medical authorization.

Epperson also claims Moore was terminated in part for improperly reporting expenses for an ink cartridge and cell phone charges. However, Moore disputes that he was ever confronted regarding his cell phone expenses, and Moore claims he learned of a problem with his ink cartridge expenses only after he was terminated. Even if Mershimer's testimony is credited, the ink cartridge and cell phone expense issues were raised for the first time only days after Moore reported a USERRA violation.

Whether a jury may accept Epperson's proffered reasons and find that Epperson would have discharged Moore even if he had not made a USERRA report is an issue for trial, not summary judgment. Therefore, Epperson's Motion for Summary Judgment is denied as to Moore's USERRA retaliation claim.

## C.      Whistleblower Claim

The MWA prohibits discharge of an employee because of a good faith report of illegal activity. Minn. Stat. § 181.932, subd. 1(a). MWA claims are analyzed under the McDonnell Douglas burden shifting framework. Thompson v. Campbell, 845 F. Supp. 665, 674 (D. Minn. 1994). To establish a prima facie retaliation claim under the MWA, a plaintiff must demonstrate that: (1) he engaged in statutorily protected conduct, (2) he suffered an adverse employment action, and (3) there is a causal connection between the two. Cokley v. City of Otsego, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001). An employee may prove causation "with circumstantial evidence that justifies an inference of retaliatory motive." Id. at 632.

To make a statutorily protected report under the MWA, the employee must act in good faith, and the employee must allege "facts that, if proven, would constitute a violation of law or

18

rule adopted pursuant to law." Abraham v. County of Hennepin, 639 N.W.2d 342, 355 (Minn. 2002). Moore argues he engaged in statutorily protected conduct when he informed Mershimer that Epperson violated USERRA by deducting from Moore's vacation time to cover his medical absences. However, Moore failed to allege facts that, if proven, would contravene USERRA. In late August or September 2005, Moore informed Mershimer that his scheduled surgical procedure "was for a service-connected medical condition, and that I believed it would fall under USERRA protection." Moore Dep. at 131. In early November, Moore again informed Mershimer he thought his absences were protected by USERRA. Id. at 173. These allegations, even if true, do not implicate USERRA because, as previously discussed, it is irrelevant under USERRA whether an employee is absent for the purpose of receiving treatment for a service-related medical condition. See 38 U.S.C. § 4303(13). Instead, the sole inquiry under USERRA is whether the employee was performing a military duty under competent authority. See id. Therefore, Moore did not engage in statutorily protected conduct under the MWA because he failed to allege facts that implicated USERRA. Epperson is granted summary judgment on Moore's MWA claim.

**D.     MHRA Claims**

**1.     Disability Discrimination**

Moore next claims he was terminated because of his Crohn's disease and related ailments in violation of the MHRA's prohibition against disability discrimination. The MHRA provides: "[I]t is an unfair employment practice for an employer, because of . . . disability . . . to . . . discharge an employee." Minn. Stat. § 363A.08, subd. 2(b). Disability discrimination claims under the MHRA are analyzed using the three-part, burden shifting test promulgated by the

United States Supreme Court in <u>McDonnell Douglas</u>.  <u>Danz v. Jones</u>, 263 N.W.2d 395, 399

(Minn. 1978).  Under that framework, the plaintiff must first establish a prima facie case of

discrimination.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  If the plaintiff

establishes a prima facie case, the burden shifts to the employer to demonstrate a legitimate non-

discriminatory reason for the employment action.  <u>Id</u>.  If this burden is met, the plaintiff must

then prove that the employer's reason for the employment action was pretextual.  <u>Id</u>.  To

establish a prima facie case of disability discrimination under the MHRA, a plaintiff must show:

(1) he is disabled within the meaning of the Act; (2) he is qualified to perform the essential

functions of the job, with or without reasonable accommodation; and (3) he suffered an adverse

employment action under circumstances giving rise to an inference of disability discrimination.

<u>Snow v. Ridgeview Med. Ctr.</u>, 128 F.3d 1201, 1205-06 (8th Cir. 1997).

### a.    Moore's Prima Facie Case

Epperson argues Moore can not establish a prima facie case of disability.  Under the

MHRA, "[a] disabled person is any person who (1) has a physical, sensory, or mental

impairment which materially limits one or more major life activities; (2) has a record of such an

impairment; or (3) is regarded as having such an impairment.  Minn. Stat. § 363A.03, subd. 12.

Major life activities include activities such as "caring for oneself, performing manual tasks,

walking, seeing, hearing, speaking, breathing, learning, sitting, standing, lifting, reaching, or

working."  <u>Weber v. Strippit, Inc.</u>, 186 F.3d 907, 915 (8th Cir. 1999).[5]

Moore asserts he was disabled during his employment at Epperson.  At his deposition,

---

[5] <u>Weber</u> analyzed claims under the Americans with Disabilities Act.  However, the
Eighth Circuit generally analyzes claims under the MHRA and the ADA using the same
standard.  <u>Philip v. Ford Motor Co.</u>, 328 F.3d 1020, 1023 n.3 (8th Cir. 2003).

Moore described the symptoms of his Crohn's disease and related ailments as frequent and bloody bowel movements, abdominal pain, fatigue, nausea, insomnia, difficulty concentrating, and headaches. Moore Dep. at 40, 44. Moore also testified that he must carefully monitor his eating so as to alleviate these symptoms. Id. at 44. Epperson argues this evidence is insufficient to show Moore was disabled because Moore's condition did not materially limit his ability to perform a major life activity such as working. However, the Court finds Moore's deposition testimony is sufficient to create a genuine issue of material fact as to whether Moore's Crohn's disease materially limited major life activities such as eating and eliminating waste. See Nesser v. Trans World Airlines, Inc., 160 F.3d 442, 445 (8th Cir. 1998) (finding clear disability where plaintiff had Crohn's disease with symptoms of abdominal pain, fever, diarrhea, flatulence, fatigue, extreme pain, and dehydration). Therefore, Moore has satisfied the first element of his prima facie case.[6]

Epperson argues Moore was not qualified to perform the essential functions of a LPR because Moore has submitted an affidavit stating that his ability to drive is limited by his primary sclerosing condition. See Moore Aff. [Docket No. 39] ¶ 8. However, Moore's affidavit was filed in May 2007. There is no evidence in the record that Moore was unable to perform the driving required of a LPR while he was employed with Epperson in 2005. The Court finds the record sufficiently shows Moore was qualified to perform the functions of the LPR position.

The final consideration is whether Moore's termination occurred under circumstances giving rise to an inference of disability discrimination. The record reflects on at least two

---

[6] Moore has argued in the alternative that he has a record of disability and that Epperson regarded him as disabled. Since Moore has adduced sufficient evidence that he was disabled, it is unnecessary to address these arguments.

21

occasions Mershimer told Moore he would need to choose between keeping his job and missing work for medical appointments, and Moore was terminated soon after returning from his third leave of absence for his medical conditions.  Moore Dep. at 167, 174, 183.  This evidence creates an inference that Moore may have been terminated because of his Crohn's disease and related ailments.  Moore has established a prima facie case of disability discrimination.

       **b.**       **Pretext**

Moore does not dispute that Epperson gave legitimate, non-discriminatory reasons for his discharge.  However, he argues Epperson's reasons were pretext for discrimination based on his medical conditions.  There are at least two ways a plaintiff can establish a question of fact regarding pretext.  Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006).  First, a plaintiff can indirectly show pretext with evidence that the employer's explanation is "'unworthy of credence' because it has 'no basis in fact.'"  Wallace, 442 F.3d at 1120, quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981), and Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002).  Second, a plaintiff can directly show pretext "'by persuading the court that a [prohibited] reason more likely motivated the employer.'"  Id. (insertion in original), quoting Burdine, 450 U.S. at 256.

Epperson's stated reasons for terminating Moore were his alleged complaints about travel and unhappiness with the job, failure to follow company procedures regarding returning to work after medical treatment, improper ink cartridge and cell phone expenses, and Moore's inability to effectively communicate with Mershimer.[7]  However, as discussed above regarding Moore's

---

[7] Epperson does not argue that Moore's absences for medical treatment were a factor in its decision to terminate him.

USERRA retaliation claim, the record is inconclusive as to whether these were pretextual reasons.

Much of the evidence is disputed regarding Moore's alleged complaints about travel and unhappiness with his job.  Moore's recollection of his conversation with Mershimer in early November 2005 conflicts with Mershimer's recollection.  A jury, and not this Court, must assess the credibility of Moore and Mershimer to determine the facts regarding this key conversation. If a jury credits Moore's testimony, then it could find that Epperson used Moore's alleged complaints about travel as a pretext for disability discrimination.

Regarding Moore's failure to follow Epperson's procedures for returning to work from medical treatment, there is no evidence that Moore was counseled when he returned to work without proper authorization in late October, and the record shows Moore submitted the necessary paperwork before returning to work in December.  On these facts, a jury could find that Epperson used Moore's failure to follow company procedures as a pretext to terminate Moore because of his absences due to his medical conditions.

Finally, as discussed above, a jury could find that Moore's alleged improper expense reports were insignificant issues that Epperson used as a pretext for disability discrimination. The Court finds there are genuine issues of material fact as to whether Epperson's stated reasons for Moore's termination were its actual reasons or merely a pretext for disability discrimination. Therefore, Epperson's Motion for Summary Judgment is denied as to Moore's MHRA disability discrimination claim.

**2.      Retaliation**

Moore also alleges he was retaliated against in violation of the MHRA.  Under the

MHRA, "[i]t is an unfair discriminatory practice . . . [for an employer] to intentionally engage in any reprisal against any person because that person . . . [o]pposed a practice forbidden under [the MHRA]."  Minn. Stat. § 363A.15(1).  The term "reprisal" includes "any form of intimidation, retaliation, or harassment."  Minn. Stat. § 363A.15.  To establish a prima facie case, Moore must show: (1) he engaged in statutorily protected conduct; (2) an adverse employment action by the employer; and (3) a causal connection between the two.  Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 444 (Minn. 1983).  Once Moore establishes a prima facie case, Epperson must provide a legitimate, non-discriminatory reason for Moore's discharge, at which point Moore must provide evidence of pretext.  See id.

Moore argues he engaged in statutorily protected conduct when he requested accommodation for his Crohn's disease in the form of leave from work and permission to work from home, and when he notified Mershimer during the week of November 7, 2005, that Mershimer's attitude regarding Moore's medical absences was belittling and hurtful.  Epperson argues this was not statutorily protected conduct because Moore was not disabled.  However, as previously discussed, Moore has presented evidence that he was disabled under the MHRA. Therefore, Moore has satisfied the first element of his prima facie case of retaliation under the MHRA.

The parties do not dispute that Moore's termination was an adverse employment action. Accordingly, the Court analyzes whether Moore has adduced sufficient evidence of a causal connection between his complaints and his discharge.  Moore has testified that Mershimer responded to Moore's absences for medical reasons by suggesting that Moore needed to choose between missing work for medical appointments and his job.  The record also shows that Moore

was offered a severance package less than two weeks after he complained that Mershimer's attitude toward his medical absences was belittling.  This evidence is sufficient for a jury to find a causal connection between Moore's termination and the fact that he opposed Mershimer's allegedly intimidating conduct.  Moore has established a prima facie case of retaliation under the MHRA.

For the reasons stated above, the Court finds that Epperson has presented legitimate, non-discriminatory reasons for Moore's discharge.  Further, the Court finds that the record is inconclusive as to whether those reasons were Epperson's actual reasons or whether those reasons are a mere pretext for a reprisal based on Moore's medical absences and complaints about Mershimer's alleged harassment.  Therefore, Epperson's Motion for Summary Judgment is denied regarding Moore's MHRA retaliation claim.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.	 Defendant Epperson Underwriting Company's Motion for Summary Judgment [Docket No. 15] is **GRANTED IN PART AND DENIED IN PART**; and

2.	Counts Three, Four, and Six of the Complaint are **DISMISSED**.

BY THE COURT:


 s/ Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: August 15, 2007